88 So.2d 189

**ATLANTIC COAST LINE RAILROAD CO.**

v.

**Mildred S. STINSON, as Adm'x.**

**6 Div. 736.**

Supreme Court of Alabama.

March 31, 1955.

Rehearing Denied June 21, 1956.

G. Ernest Jones, Jr., Beddow & Jones, Birmingham, and Jos. S. Lord, III, Richter, Lord & Farage, Philadelphia, Pa., for appellee.

Peyton D. Bibb, Wm. M. Acker, Jr., Graham, Bibb, Wingo & Foster, Birmingham, for appellant.

**STAKELY, Justice.**

This is an action instituted against the Atlantic Coast Line Railroad Company under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., by Mildred S. Stinson, as administratrix of the estate of A. Bruce Stinson, deceased, to recover damages for his death. Liability is predicated upon the alleged negligence of the defendant in the operation of its railroad which allegedly caused the death of the deceased, while in its employment. Upon the trial there was a verdict for the plaintiff and a judgment rendered thereon. Motion for a new trial was overruled and hence this appeal.

As submitted to the jury the complaint as last amended consisted only of count 5. In substance it alleged that A. Bruce Stinson was an employee of the defendant railroad and was killed while acting within the line and scope of his employment and that the defendant railroad was engaged in interstate commerce at the time of the death of decedent. It was further alleged that the death of Stinson resulted from the negligence of one or more of the officers, agents or employees of the defendant, whose name and names are unknown to the plaintiff, while acting within the line and scope of their employment in this to wit: that he or they so negligently operated the aforesaid railroad train of the defendant as to cause plaintiff's intestate to be run over, upon or against by the said railroad train and as a proximate result and consequence thereof plaintiff's intestate was killed.

The defendant filed a plea of the general issue in short by consent with leave to give in evidence any matter which would be admissible in evidence if well pleaded and with leave to the plaintiff to make like reply.

The proof shows that on August 6, 1951, the crew of Work Extra 1707 consisting of conductor L. B. Cloud, flagman C. C. Hayes, brakeman Joe Murphy, fireman W. F. Cook and engineer A. B. Stinson was called to duty at Montgomery, Alabama, to report to Ramer, Alabama, to handle a wrecker for a train that had been derailed. When Work Extra 1707 arrived at Ramer they took over the work train, received the usual work train orders and proceeded to the place of the derailment, which was between 2½ and 3 miles beyond Ramer. They arrived at the scene of the derailment at about 9:45 p. m. At this time Work Extra 1707 was made up of the following cars from the front to the rear:

1. Wrecker
2. Wrecker tank
3. Engine
4. Gondola car of ties
5. Gondola car of coal
6. Flat car or wheel car
7. Bunk car
8. Kitchen car
9. Living and dining car
10. Caboose.

Upon arrival at the scene of the derailment all cars were cut from the engine except the wrecker cars. The engine and the wrecker cars were then moved forward by Stinson, the engineer, about four car lengths, nearer the derailment and "spotted". After the engine of Work Extra 1707 had been "spotted" by Stinson as aforesaid, its fireman Wm. F. Cook, upon receiving permission from Stinson, left the engine to go to the wreck and "to look around".

At 10:15 another train, the Western Wrecker, consisting of a total of five cars, arrived at the western end of the derailed cars. On this train was a fireman named McClain.

When fireman Cook returned to Work Extra 1707 fireman McClain of the Western Wrecker was in the engine cab of Work Extra 1707 but Stinson was not. McClain told Cook that Stinson had been on the engine when he reached it and had asked him, (McClain) to look out for the engine "until Stinson or Cook returned".

There was proof that after Stinson had left his engine he went to the kitchen car of 1707 and ate a plate of food given him by the cook. He left the dining car, leaving his cap on a stool. Stinson did not return to his engine. He was never seen alive after having left the dining car. There was proof that at the time Stinson left the dining car the cars were standing still and they were not moved, according to conductor Cloud, until it was "right at 10:30". Other testimony shows that after rerailing the wrecked car there was a coupling movement to the rerailed car, a lowering of the boom on the wrecker, a coupling to the rest of the train and then that conductor Cloud, who watched this operation, walked back to the caboose at the rear of the train before the move actually started on his signal given from the rear end of the caboose.

Stinson was not found until about two or three hours later after he left the diner when W. C. Stripling, the engineer of Through Train 216, going towards Ramer after the track had been cleared, discovered Stinson's nude body severed across the north rail of the track at a point something over three-fourths of a mile from where he had last been seen at the diner. The lower part of Stinson's body was between the rails with the feet angling down the hill toward the west. The upper part was outside the rail with the head turned downhill. The arms were pulled back to the shoulders, the hands were gripped and the body was naked except for the socks. His clothes were found "wadded up" about 150 feet from the body toward the derailment. There was evidence of blood on the tracks and scuff marks to indicate he was dragged the 150 feet from the clothes to where the body was found.

There was proof showing that fireman Cook in Stinson's absence in operating the engine made three separate back-up moves. First, after coupling to the rerailed hopper, he moved back two car lengths and stopped so that the boom of the wrecking derrick could be swung; second, he moved back the remaining two car lengths, separating the engine from the cut cars in order to couple; third, he moved back two and one-half to three miles to Ramer. This last move was made without incident at about ten miles per hour, the caboose being in the lead.

When the absence of Stinson was noted the train was inspected at Sprague which is a place on the railroad between Ramer and Montgomery. A lot of blood was found on the northeast wheel of the wheel car and a small amount of blood on the wheel next to it. Blood was also found on the body bolsters and truck bolsters of the same car. Portions of the stomach and lungs were found between the brackets of the wheel (a roll of metal cast into the inside of the wheel). There was no blood on the wheels of the caboose or of the other cars between it and the wheel car. So far as we can discover there is nothing in the record to show that any portion of the clothing of the deceased or any shred thereof was found beneath the wheel car or under any other part of the train.

The proof showed rules of the Atlantic Coast Line Railroad Company as follows:

As to Engineers (Enginemen)—Rule 972. "They must not leave their engines during a trip except in cases of necessity, and then the fireman or some other competent person must be left in charge of the engine."

Rule 973:—"They must not permit an unauthorized person to run the engine. They may permit the fireman to do so, but only under their immediate supervision."

As to Firemen. Rule 990:—"Firemen will report to the Trainmaster in all matters connected with the movement of trains and engines; to the Master Mechanic in all matters relating to motive power. They must comply with instructions of the Road Foreman of Engines and other Mechanical Department Officers. They must comply with instructions of the engineman (engineer) while on duty. At stations and yards they are under the jurisdiction of the Station Master or Road Master; within shop limits, of the Engine House Foreman."

Rule 994:—"They must remain on engines during switching operations, unless otherwise directed. They must take charge of the engine should the engineman be absent, and must not leave the engine during absence of engineman, nor permit any unauthorized person upon the engine. If engineman should become disabled they must stop the engine. They must not run an engine in the absence of the engineman unless, in an emergency, they are directed to do so by the conductor or some other person in authority."

In addition to the rules pertaining to the fireman and engineer, the following rules were shown.

"Rule 20:—The engine bell must be rung when an engine is about to move except in instances where the stop and start, either forward or backward, is momentary, and is a continuous switching move and while approaching and passing public crossings at grade, while passing trains on an adjacent track, and when necessary to prevent accidents."

Rule 32:—"The unnecessary use of the horn, whistle or bell is prohibited."

Rule 108:—"In case of doubt or uncertainty, the safe course must be taken."

The fundamental question in the case is whether the court erred in refusing the affirmative charge requested in writing by the defendant.

In reviewing the court's refusal to give the affirmative charge in Atlantic Coast Line R. Co. v. McMoy, 261 Ala. 66, 73 So.2d 85, 90, this court said:

"Error is predicated on the refusal of the court to give the general affirmative charge with hypothesis. It is well understood that actionable negligence may be established by circumstantial evidence. Atlantic Coast Line R. Co. v. Taylor, [260 Ala. 401] 71 So.2d 27; Atlanta & St. Andrews Bay Ry. Co. v. Burnett, 259 Ala. 688, 68 So.2d 726; Lavender v. Kurn, 327 U.S. 645, 66 S. Ct. 740, 90 L.Ed. 916; Tennant v. Peoria & P. U. R. Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520. Furthermore, where the affirmative charge was refused the defendant, the entire evidence must be viewed in its most favorable aspect to the plaintiff and where this is done and a reasonable inference may be drawn adverse to the party requesting the affirmative charge, such charge is properly refused. Atlantic Coast Line R. Co. v. Taylor, supra, and cases cited therein. * *"

■ Under the plain provisions of the Federal Employers' Liability Act the gist of the action is negligence on the part of the defendant which in whole or in part proximately caused the injury complained of. The plaintiff is required to present probative facts from which the negligence alleged and the causal relation between the negligence and the injury complained of can be reasonably inferred before such issues may be submitted to the jury. Atlantic Coast Line Railroad Co. v. Barnes, 261 Ala. 496, 75 So.2d 91; Reynolds v. Atlantic Coast Line Railroad Co., 251 Ala. 27, 36 So.2d 102, affirmed 336 U.S. 207, 69 S. Ct. 507, 93 L.Ed. 618; Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916; Tennant v. Peoria & P. U. R. Co., 321 U. S. 29, 64 S.Ct. 409, 88 L.Ed. 520; Atlantic Coast Line Railroad Co. v. McMoy, supra.

There are three cases strongly relied on by the appellee to which we wish to refer at this point. In Lavender v. Kurn, supra, the Supreme Court of the United States held that the case was a case for the jury, that actionable negligence may be established by circumstantial evidence and that where the jury returns a verdict on probative facts from which negligence which

in whole or in part proximately caused the injury may reasonably be inferred, it is no answer to say that the jury's verdict involved speculation and conjecture. In Lavender v. Kurn, supra, it was shown that the decedent suffered the injuries from which he died at a place where his duties required him to be. The railroad contended that the decedent was murdered but the court held that where there was proof of probative facts from which it could be inferred that the negligence of the railroad in whole or in part proximately caused the death of the decedent, the court on appeal would not disturb the verdict on the theory that the jury speculated as to whether death was the result of negligence or grew out of some other cause.

This court as it was its duty to do followed the reasoning in the foregoing decision of the Supreme Court of the United States in Atlanta & St. Andrews Bay Ry. Co. v. Burnett, 259 Ala. 688, 68 So.2d 726, and in Atlantic Coast Line Railroad Co. v. McMoy, supra, and held that since there was proof of probative facts from which the jury had a right to infer negligence of the defendant and that the decedent was killed by the railroad at a place where his duties to the railroad required him to be, the court would not speculate as to whether at the time of his death he was doing his duty or engaging in something not pertaining to his duty. We call attention to the fact that both in Atlanta & St. Andrews Bay Ry. Co. v. Burnett, supra, and Atlantic Coast Line R. Co. v. McMoy, supra, the work of the decedent required him to work on the ground alongside of or between the cars of the defendant railroad.

■■■ As we read the present record, there appears to be a conflict in the evidence as to whether fireman Cook in running the engine abided by the rules of the company in making the movements to which we have referred, in the absence of the engineer and in his failure to ring the bell at each movement. Upon a careful consideration it is our view that the plaintiff was entitled to go to the jury on these issues, which means that there was sufficient evidence for the jury to find that there was negligence on the part of the Atlantic Coast Line Railroad Company. Violation of one of defendant's rules is evidence of negligence. Tennant v. Peoria & P. U. R. Co., supra; Tiller v. Atlantic Coast Line R. Co., 323 U.S. 574, 65 S.Ct. 421, 89 L.Ed. 465; Alabama Great Southern Railroad Co. v. Davis, 246 Ala. 64, 18 So.2d 737.

This brings us to what we regard as the vital question in the case. Did the negligence, if any, of the defendant railroad in whole or in part proximately result in the death of Stinson?

The proof shows that Stinson's nude body was found severed across the rail of the track about three-fourths of a mile from where he had last been seen alive over two hours before. All of his cothes except his socks which he had on were found "wadded up together" about 150 feet nearer to the place where he had last been seen alive than where his body was found. There were markings on the track indicating that something had been dragged between the place where the nude body was and the clothing. There was no evidence, however, as to how the engineer got from the diner, the place where he was last seen alive, to the above spot about three-fourths of a mile away. There was no evidence as to what he was doing and had been doing in the meantime. There was no evidence as to how he became nude. There was no evidence that he was alive and on the track at the time any train movement approached and passed the point where his body was found.

■■■ Can it be said that there was any evidence which showed that Stinson's body was found at a place where his duty required him to be, as was the situation in the cases cited above? The duties of Stinson required him to be on the engine in order to operate the engine as its engineer. We consider it to be a correct principle that when a railroad provides food for its employees and they are using the facilities so provided to prepare themselves for their work or to rest and recuperate, they must be regarded as in its employ.—Mostyn v. Delaware L. & W. R. Co., 2 Cir., 1947, 160

F.2d 15, certiorari denied 1947, 332 U.S. 770, 68 S.Ct. 82, 92 L.Ed. 355; Virginian Ry. Co. v. Early, 4 Cir., 1942, 130 F.2d 548; North Carolina R. Co. v. Zachary, 1914, 232 U.S. 248, 34 S.Ct. 305, 58 L.Ed. 591.

We consider that in going to the diner Stinson was acting within the line and scope of his employment. His next duty would be to return from the diner to the engine. However, as we have pointed out, there was no evidence as to what happened after he left the diner and we can only speculate as to what proximately caused Stinson's death and if it was in the course of his employment, there being no duty of Stinson to perform which we can infer that he was doing when he was struck by the movement of the train. Under all the evidence there was no duty on Cook to find out where Stinson was or to anticipate peril to him. Stinson had no duties to perform in between or alongside the cars of the train, as was the situation in Atlanta & St. Andrews Bay Ry. Co. v. Burnett, supra, and Atlantic Coast Line Railroad Co. v. McMoy, supra, referred to above. Alabama Great Southern R. Co. v. Davis, 246 Ala. 64, 18 So.2d 737.

■ Consequently the evidence fails to show probative facts from which a jury could infer that when Stinson was run over by the train, he was where his duty required him to be. Since this is true, the evidence does not show that the negligence, if any, of the defendant in whole or in part proximately caused his death. Brady v. Southern Railway Co., 320 U.S. 476, 64 S.Ct. 232, 88 L.Ed. 239; Reynolds v. Atlantic Coast Line R. Co., supra. In the last cited case this court said:

"A party claiming under the Act must in some adequate way establish negligence, and it must appear that such negligence was the proximate cause, in whole or in part, of the accident.

\* \* \* \* \* \*

"In order to state a cause of action, it must be made to appear by proper averments [and, we interpolate, by

proper proof] that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances." [251 Ala. 27, 36 So.2d 104.]

We conclude that the court was in error in refusing to give the affirmative charge as requested by the defendant in the lower court.

Reversed and remanded.

LIVINGSTON, C. J., and LAWSON and MERRILL, JJ., concur.